J-S16029-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SIENNA BROWN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THOMAS DREIXLER, JR. | : | |
| | : | |
| Appellant | : | No. 1461 MDA 2017 |

Appeal from the Judgment Entered August 30, 2017
In the Court of Common Pleas of Columbia County Civil Division at
No(s):  2014-CV-0000156-CV

BEFORE:   BOWES, J., MURRAY, J., and PLATT[*], J.

MEMORANDUM BY MURRAY, J.:                    **FILED APRIL 24, 2018**

Thomas Dreixler, Jr. (Appellant) appeals from the judgment entered against him following a non-jury trial on the claims of Appellee, Sienna Brown (Sienna), alleging undue influence and unjust enrichment in connection with a 529 college tuition savings account[1] (529 Plan).  Upon careful review, we affirm.

The trial court made the following detailed findings of fact.  **See** Trial

_____

* Retired Senior Judge assigned to the Superior Court.

[1] As accurately stated at trial by Decedent's financial adviser, Timothy Novatnack: "529 accounts are college advantage accounts.  It's a way to put assets aside for future educational expenses in a tax efficient manner."  N.T. Trial, 8/10/17, at 64.  **See also** 26 U.S.C. § 529.

Court Opinion, 8/14/17, at 2-7. Joseph Krizan (Decedent) established a 529 Plan naming his granddaughter, Sienna, as the beneficiary. Decedent also named his adopted daughter, Brenda Brown (Brenda), as successor owner of the plan.[2] The owner of the plan retained control over the assets. At the time of Decedent's death, the 529 Plan contained $89,518.14.

Brenda and Sienna lived in California but had a close relationship with Decedent, who lived in Mifflinville, Pennsylvania. Additionally, Decedent's next-door neighbors, Greg and Deborah Lutz, were "like family" to Decedent; they regularly prepared meals for him, took him to doctor appointments, and appropriately helped with his finances. Trial Court Opinion, 8/14/17, at 4. Decedent often spoke proudly of Sienna, and it was Ms. Lutz who suggested to Decedent that he establish a 529 account for Sienna.

In September of 2012, Decedent, who was 88 years old, accused Ms. Lutz of taking coins that were intended for Sienna. "In actuality, he had previously sent these coins to Sienna." *Id.* Ms. Lutz was concerned about this false accusation and distanced herself from Decedent, and she and her husband became "wary of his apparently changing mental status." *Id.* at 5. However, they continued to transport Decedent to his appointments. Also that month, Decedent named his sister, Ann Cantway (Ann), who lived in

---

[2] Brenda Brown is Sienna's mother and was Decedent's step-**grand**daughter. When Brenda was 18 years old, Decedent adopted her so that he would have an heir. N.T., 8/10/17, at 7 (Brenda's testimony).

Illinois, as his power of attorney.

In the late spring of 2013, Decedent, who was suffering from lung cancer, fell increasingly ill and Brenda visited to assist him; it was her fourth visit in a year. During this visit, Decedent was hospitalized. Brenda had to return to work and thus contacted Decedent's sister, Ann, to assist Decedent. Trial Court Opinion, 8/14/17, at 3-4. Appellant is Ann's grandson; Appellant's relationship to Decedent was that of grand-nephew.

On June 3, 2013, Brenda returned to California. The same day, Ann, her daughter Kathie Dreixler, Appellant (then approximately 23 years old), as well as "various other relatives" (collectively, "the Illinois relatives") arrived at Decedent's home to care for him.[3] *Id.* One week later, Decedent, Ann, and Appellant had a phone conference with Decedent's financial adviser, Timothy Novatnack, who had not spoken to Decedent in person since 2008. *Id.* at 5. Decedent and Ann could not hear well and designated Appellant to speak on their behalf. Based on this conversation, the beneficiaries on one of Decedent's annuity accounts were changed.[4] Additionally, **Appellant** told Mr. Novatnack that Decedent was questioning the legality of his adoption of

_____

[3] Appellant's mother is Kathie Dreixler. Appellant testified that in July 2013, he, his parents, siblings, grandmother, uncle, aunt, and others alternated staying with Decedent. N.T., 8/10/17, at 39.

[4] The former beneficiaries were Decedent's stepson and step-grandson, and Decedent changed the beneficiary to only one of them (it is not clear which one). Trial Court Op., 8/14/17, at 3; N.T., 8/10/17, at 81.

Brenda,[5] and Decedent, Ann and Appellant together accused Ms. Lutz of possible financial improprieties.

Four weeks after the Illinois relatives' arrival, on July 2, 2013, Decedent executed a new will. His prior will, of September 2010, named Ms. Lutz executrix and gave her his house and automobile; the 2010 will gave Sienna "50% of the estate and some coins," and gave Ann 10% of the estate. Trial Court Opinion, 8/14/17, at 2. Appellant was not named in the 2010 will. The July 2, 2013 will, however, gave Decedent's house and car to Appellant, and the remaining estate to Appellant, his mother, and Ann. N.T., 8/10/17, at 41. Sienna only received Decedent's coins.

The following day, July 3, 2013, Decedent met with Mr. Novatnack, with Appellant present. Decedent changed the successor owner of the 529 account to Appellant. Decedent also requested a change to the beneficiaries of two additional annuity accounts; one annuity was changed. On July 5th, again with Appellant present, Decedent told Mr. Novatnack that he questioned the legality of his adoption of Brenda.

On July 18, 2013, hospice care was established for Decedent. On July 21st, Mr. Novatnack was called so that Decedent could change the beneficiary of an annuity, of which Sienna and her mother Brenda were the beneficiaries.

---

[5] At trial, upon cross-examination, Brenda testified that she had a copy of the adoption decree. *Id.* at 23.

Trial Court Opinion, 8/14/17, at 6. Mr. Novatnack, however, found Decedent in poor physical and mental condition and unable to sufficiently communicate. The trial court stated, "[a]fter that time and up to, and even after Decedent's death, [Appellant] continued trying to [change] the beneficiaries . . . through the power of attorney. This was not successful." *Id.*

Two days later, on July 23, 2013, Decedent died. The Illinois relatives did not inform Brenda of Decedent's death, and she learned of his passing from one of his neighbors. Prior to trial, "there was no indication in the record that [Appellant] had cashed the proceeds of the 529 account. This was revealed at the end of the non-jury trial." Trial Court Opinion, 8/14/17, at 8 n.2. Appellant used the $89,518.14 that was in the 529 Plan to repay his own student loans, which were approximately $90,000. *Id.* at 6.

On February 7, 2014, Sienna, who was then 15 years old, initiated a lawsuit[6] alleging that Appellant unduly influenced Decedent — who was suffering from dementia, cancer, hearing deficiency, and other serious health issues — to transfer successor ownership of the 529 Plan to himself, and that Appellant was unjustly enriched as a result of the transfer. The complaint requested the court to void the transfer of ownership to Appellant or, in the alternative, direct that the funds in the 529 Plan be placed in a constructive

---

[6] The initial complaint was filed by Brenda in her capacity as Sienna's mother. When Sienna reached the age of majority, she filed an amended complaint in her individual capacity.

trust for Sienna's benefit. Appellant filed preliminary objections, arguing, *inter alia*, that Sienna lacked standing to sue, which the trial court denied.

The court conducted a non-jury trial on August 10, 2017. Sienna introduced testimony from her mother and Decedent's neighbor, Ms. Lutz. Pertinently, they were both asked about what Decedent told them regarding his intent for designating Sienna as the beneficiary of the 529 Plan. Appellant objected on hearsay grounds, but the trial court found the responses would fall under the state-of-mind exception and overruled the objections. Brenda and Ms. Lutz then responded that Decedent told them he wanted Sienna to go to college and that he wished to help her. Sienna testified that she was currently an "A" student at a California community college and planned to transfer to the University of California at Berkeley. Sienna also called Appellant to testify as if on cross-examination. Appellant denied knowing before Decedent's death that he had been named the successor owner of the 529 Plan. N.T., 8/10/17, at 41.

Following the close of Sienna's case in chief, Appellant moved for a compulsory nonsuit for legal insufficiency, which the trial court denied. N.T., 8/10/17, at 61-62. Appellant then offered testimony from Decedent's financial adviser, Mr. Novatnack. Mr. Novatnack testified that Appellant was present on July 3, 2013, when Decedent changed the successor owner of the 529 Plan to Appellant, and that on that day, Mr. Novatnack believed Decedent appeared "fine." *Id.* at 79-80.

Appellant testified on his own behalf. He testified that in June 2013, he had recently graduated from college, had approximately $92,000 in student loan debt, and had left his job in order to assist Decedent. *Id.* at 115, 124. Appellant also testified that Decedent was coherent and "perfectly fine up to almost the very end," although he was tired and slept more; and that Decedent had questioned whether Brenda was his legally adopted daughter. *Id.* at 114, 121. The trial court asked Appellant whether he ever considered that Decedent had designated Sienna the beneficiary of the 529 Plan. *Id.* at 126. The following exchange occurred:

> [Appellant:] I assumed that he put me there because he was going to pay for my school loans, I didn't —
>
> [Trial court:] There was no disconnect between you being the owner but [Sienna] being the beneficiary for her school loans [sic]?
>
> A. No, because when I talked to Hartford, I asked them what is this account, I didn't know what it was. And they explained to me it was money left to you to do what you want. Right now the beneficiary is Sienna but you can do whatever you'd like with this account, it is your money left to you by your uncle.
>
> Q. Did you ever wonder why he had Sienna on there as a beneficiary of a 529 education account?
>
> A. I didn't make any assumptions about that.
>
> Q. So you put it toward — you used the 529 education to count towards your education [debt] rather than the beneficiary's education?
>
> A. Correct.

*Id.* at 126-27.

- 7 -

The trial court entered judgment in Sienna's favor of $89,518.14 and ordered Appellant to place this amount in a constructive trust for Sienna's benefit. The court found Appellant was not credible, whereas "[t]he other witnesses were very credible." Trial Court Opinion, 8/14/17, at 7. The court additionally found: Decedent was not adept at handling finances; his neighbors, the Lutzes, handled his finances "extremely well"; in June and July 2013, Decedent suffered from a weakened intellect and was in a confidential relationship with Appellant, who was acting as agent for and in conjunction with Ann (Decedent's sister); Appellant unduly influenced Decedent to designate him as successor owner of the 529 Plan; Appellant "committed fraud in inducing Decedent to" give him control of the 529 Plan and implying or encouraging Decedent's false beliefs that Brenda was not legally adopted and the Lutzes were exploiting him; and Appellant was unjustly, to Sienna's detriment, enriched by using the 529 Plan funds for himself. *Id.* at 4-7. The court acknowledged Mr. Novatnack's testimony that he believed Decedent was "fine" to make changes to his accounts, but the court also found no evidence that Mr. Novatnack knew of Decedent's physical and mental state. *Id.* at 6.

Appellant filed a timely motion for post-trial relief, which the trial court denied. Final judgment was entered on August 30, 2017. Appellant timely filed a notice of appeal and complied with the court's Pa.R.A.P. 1925 order to file a concise statement of errors complained of on appeal. The trial court subsequently issued a Pa.R.A.P. 1925(a) opinion, which expressed that

"[Appellant's] undue influence, unjust enrichment, and fraud were egregious, proven largely by the testimony of third parties, by undisputed facts, and by admissions of [Appellant] himself." Trial Court Opinion, 10/23/17, at 5.

Appellant raises six issues for our review:

I. Whether the trial court erred in denying [Appellant's] preliminary objections with respect to lack of standing of [Sienna] to sue.

II. Whether the trial court erred in admitting hearsay testimony concerning [D]ecedent['s] donative intent with respect to the 529 account.

III. Whether the trial court erred in denying [Appellant's] motion for nonsuit with respect to [Sienna's] claims for undue influence and unjust enrichment.

IV. Whether the trial court erred in finding that [Appellant] exerted undue influence over [Decedent].

V. Whether the trial court erred in finding that [Appellant] was unjustly enriched at the expense of [Sienna].

VI. Whether the trial court erred in finding that [Appellant] engaged in fraudulent conduct with respect to [Decedent].

Appellant's Brief at 3 (unnecessary capitalization omitted).

In his first issue, Appellant argues that the trial court erred in denying his preliminary objections with respect to Sienna's standing to sue. Appellant suggests that the question of standing in this context is a matter of first impression. Finding no cases directly on point, he argues that this Court should apply our treatment of standing for beneficiaries of life insurance policies to resolve questions of standing for beneficiaries of 529 plans. Appellant cites *Lindsey v. Lindsey*, 492 A.2d 396 (Pa. Super. 1985), for the

propositions that "the naming of a beneficiary on a life insurance policy vests nothing in that person during the lifetime of the insured; the beneficiary has but a mere expectancy," and that "the naming of a beneficiary on a life insurance policy is *sui generis*; it is not a conveyance of the insured's asset." Appellant's Brief at 15, *quoting* **Lindsey**, 492 A.2d at 398. Appellant then contends that likewise, a beneficiary of a 529 plan has but "a mere expectation that does not confer standing to challenge transfers of ownership." Appellant's Brief at 14.

The standard of review we apply when considering a trial court's denial of preliminary objections is well settled:

> [O]ur standard of review of an order of the trial court overruling or granting preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.
>
> Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

**Richmond v. McHale**, 35 A.3d 779, 783 (Pa. Super. 2012) (citations omitted).

"Threshold issues of standing are questions of law; thus, our standard

- 10 -

of review is *de novo* and our scope of review is plenary." ***Rellick-Smith v.***

***Rellick***, 147 A.3d 897, 901 (Pa. Super. 2016) (internal citation omitted).

> [T]he core concept of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not "aggrieved" thereby and has no standing to obtain a judicial resolution to his challenge. A party is aggrieved for purposes of establishing standing when the party has a substantial, direct and immediate interest in the outcome of litigation. A party's interest is substantial when it surpasses the interest of all citizens in procuring obedience to the law; it is direct when the asserted violation shares a causal connection with the alleged harm; finally, a party's interest is immediate when the causal connection with the alleged harm is neither remote nor speculative.

***Id.*** (citation omitted).

Here, the trial court determined Sienna had standing to sue because, as beneficiary of the 529 Plan, she "had a substantial, direct, and immediate interest in maintaining [D]ecedent's interest in the integrity of the account." Trial Court Opinion, 10/23/17, at 2. We agree. Aside from emphasizing that an owner of a life insurance policy and owner of a 529 plan may both change the beneficiary, Appellant provides no explanation or legal support for why principles of insurance law should control in the context of 529 plans, nor why this Court should not apply our long-standing analysis for standing.. Applying the test summarized in ***Rellick-Smith***, above, we first conclude that Sienna had a substantial interest in the litigation because her interest in the 529 Plan funds designated by Decedent to pay for her college education, surpasses the general societal interest of deterring fraud and undue influence. ***See id.*** We further find that Sienna's interest in this litigation was direct, as she

- 11 -

established a causal connection between the asserted violation (Appellant's undue influence) and the harm complained of (transfer of the 529 Plan successor ownership): but for Appellant's conduct, Sienna would receive the funds under the 529 Plan as Decedent intended. Finally, we hold Sienna established that her interest in the litigation is immediate, as the causal connection between Appellant's conduct and her injury was not remote. Accordingly, we conclude that the trial court did not err in denying Appellant's preliminary objections.

In Appellant's second issue, he argues that the trial court erred in admitting the hearsay testimony, provided by Brenda and Ms. Lutz, that Decedent's intent for designating Sienna as the beneficiary of the 529 Plan was to help her attend college. Appellant contends that the testimony does not meet any of the qualifications for the state-of-mind exception to apply — he alleges the testimony was not relevant to establishing any claim or defense, did not demonstrate that Decedent acted in conformity with the statements, and did not relate to the terms, execution, or revocation of a will.

"The well-established standard of review regarding the admission or exclusion of evidence is very narrow: [t]hese matters are within the sound discretion of the trial court, and we may reverse only upon a showing of abuse of discretion or error of law." **Zuk v. Zuk**, 55 A.3d 102, 112 (Pa. Super. 2012). Generally, hearsay is not admissible. Pa.R.E. 802. "Hearsay" is defined as "a statement that . . . the declarant does not make while testifying

at the current trial or hearing; and . . . a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c)(1)-(2). The state-of-mind exception to the hearsay rule, found in Pa.R.E. 803(3) provides:

> **Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent or plan) . . . but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3).

> Traditionally, statements of the declarant's then existing state of mind are considered reliable based on their spontaneity. There are ordinarily three instances in which the state of mind exception is applicable. First, the exception may apply to prove the declarant's state of mind when that state of mind is an issue directly related to a claim or defense in the case. Second, the exception can apply to demonstrate that a declarant did a particular act that was in conformity with his or her statement after having made the statement. Finally, an out of court statement related to the person's memory or belief is admissible in the limited instance where it relates to the "execution, revocation, identification or terms of the declarant's will."

*Schmalz v. Manufacturers & Traders Tr. Co.*, 67 A.3d 800, 804–805 (Pa. Super. 2013) (citations omitted).

Instantly, Sienna established the first basis for the state-of-mind exception: Decedent's stated intent for naming her the beneficiary of the 529 Plan was relevant to her claim that Appellant unduly influenced Decedent to change the successor owner of the plan from her mother, Brenda, to himself, as this change permitted Appellant to use the funds for himself, which was against Decedent's stated wishes. *See id.* Decedent's intent for naming Sienna as beneficiary was also relevant to Sienna's claim that Appellant was

unjustly enriched, as the funds were not intended for Appellant's use, but instead for Sienna's college education. Accordingly, the trial court did not abuse its discretion in allowing the testimony. **See Zuk**, 55 A.3d at 112.

In Appellant's third issue, he argues that the trial court erred in denying his motion for nonsuit on Sienna's claims of undue influence and unjust enrichment. Appellant asserts that the court improperly considered testimony adduced after the close of Sienna's case-in-chief. Appellant's Brief at 20, *quoting* Pa.R.C.P. 230.1(a)(2) ("The court in deciding the motion [for nonsuit] shall consider only evidence which was introduced by the plaintiff and any evidence favorable to the plaintiff introduced by the defendant prior to the close of the plaintiff's case."). This issue is moot.

Our Supreme Court has stated:

A defendant's right to request a non-suit is based on his offering no evidence, and the court cannot grant a non-suit after the introduction of evidence by the defendant. . . . If a non-suit motion made at the close of the plaintiff's case is refused by the trial judge, the defendant has an option either to rest on that motion and present no evidence, or put [on] a case. If the defendant elects to proceed, . . . the non-suit stage is over, and the correctness of the court's ruling is moot.

**F.W. Wise Gas Co. v. Beech Creek Railroad Co.**, 263 A.2d 313, 315 (Pa. 1970). In **Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co.**, 933 A.2d 664 (Pa. Super. 2007), the defendant moved for nonsuit following the plaintiff's presentation of evidence. **Id.** at 668. The trial court denied his motion, and the defendant presented his own evidence. **Id.** On appeal, the defendant challenged the trial court's denial of his motion for nonsuit. **Id.**

- 14 -

Citing **F.W. Wise Gas Co.**, this Court concluded this issue was moot. **Id.**

Here, once Appellant presented evidence, the court could not have granted nonsuit. Thus, his appellate argument — that the court should have granted nonsuit — is moot. **See F.W. Wise Gas Co.**, 263 A.2d at 315; **Northeast Fence & Iron Works, Inc.**, 933 A.2d at 668.

In Appellant's fourth issue, he claims the trial court erred in finding he exerted undue influence over Decedent. Appellant contends Sienna failed to present evidence that he and Decedent were in a confidential relationship. In support, he notes the trial court relied on **Fox v. Fox**, 189 A. 758 (Pa. Super. 1937), in which a son abused his position as power of attorney to withdraw funds and seize property of his father. Appellant underscores that in this case, it was his grandmother, Ann, who had power of attorney, and Ann never executed any checks on Decedent's behalf. Appellant further maintains there was no evidence Decedent was guided by Appellant's judgment. In addition, Appellant avers there were no "wild disparities in the amounts distributed to the other beneficiaries"; Appellant points out that while he received $89,518.14,[7] Sienna and Brenda jointly received an annuity in the amount of $160,218.64. Appellant's Brief at 25. Finally, Appellant claims there was no evidence Decedent suffered from a weakened intellect. Appellant notes that Sienna did not offer testimony from a health care provider, and instead only

---

[7] As noted above, this is the same amount contained in the 529 Plan at the time of Decedent's death.

presented Ms. Lutz's testimony that Decedent "was in some way forgetful, though few or no specifics were offered." *Id.* at 26. Appellant cites instead Mr. Novatnack's testimony "that as late as June 3, 2013 . . . Novatnack found no problems with [Decedent's] affect or capability to make decisions." *Id.* at 26-27.

This Court has stated:

When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of [ ] discretion.

*Owens v. Mazzei*, 847 A.2d 700, 706 (Pa. Super. 2004) (citations omitted).

"[U]ndue influence is a 'subtle,' 'intangible' and 'illusive' thing," "generally accomplished by a gradual, progressive inculcation of a receptive mind." Consequently, its manifestation "may not appear until long after the weakened intellect has been played upon." Because the occurrence of undue influence is so often obscured by both circumstance and design, our Courts have recognized that its existence is best measured by its ultimate effect. Thus, the Courts' holdings establish a presumption of undue influence when the evidence demonstrates: (1) that a person or persons in a confidential relationship with a testator or grantor has (2) received a substantial portion of the grantor's property, and (3) that the grantor suffers from a weakened intellect. Once the presumption has attached, the burden of proof shifts to the defendant to disprove undue influence by clear and convincing evidence that one of the foregoing criteria is not established.

*Id.* (citations omitted). "[A confidential relationship] appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed[.]" *Id.* at 709 (citation omitted).

- 16 -

Here, the trial court first found Decedent had a confidential relationship with Appellant. Trial Court Opinion, 8/14/17, at 11. Appellant's insistence that he did not have power of attorney ignores the fact that the trial court properly considered the full context of the circumstances in June and July of 2013. Appellant's grandmother, Ann, was Decedent's power of attorney and deferred to Appellant to act as such; when the 529 Plan ownership, Decedent's will, and other financial accounts were changed, Appellant "and many family members were with [Decedent] all the time. They had mastery over him. He was in a helpless position and needed people to assist him." ***See Owens***, 847 A.2d at 706 (existence of undue influence is best measured by its ultimate effect); Trial Court Opinion, 8/14/17, at 11-12. We note that Appellant and his family came to Pennsylvania on June 3, 2013, and called Decedent's financial advisor one week later to change the beneficiaries on an annuity. On July 2nd, Appellant assisted Decedent in executing a new will, and on July 3rd, the 529 plan successor ownership was changed. On July 21st, hospice was called and Decedent died on July 23rd. The will, 529 plan and annuity beneficiaries were all changed in the **last 50 days** of decedent's life.

Next, Appellant's argument — that he did not receive a "substantial portion" of Decedent's estate, but rather a lesser portion than the combined share that Sienna and Brenda received together — is not persuasive. This litigation does not concern the distribution of Decedent's estate or Decedent's will. Rather, it pertains only to the 529 Plan, and it is undisputed that

- 17 -

Appellant used the entire account, $89,518.14, for his own benefit.[8]  Finally, the court found that Decedent had a weakened intellect.  Appellant again attempts to have this Court ignore the trial court's credibility findings; while Appellant relies on Mr. Novatnack's testimony, he discounts the trial court's express finding that there was no evidence Mr. Novatnack was fully aware of Decedent's mental and physical state.  *See Owens*, 847 A.2d at 706; Trial Court Opinion, 8/14/17, at 6.  We hold the trial court did not abuse its discretion in finding Appellant committed undue influence on Decedent.

In his fifth issue, Appellant avers the trial court erred in finding he was unjustly enriched at Sienna's expense.  In support, he contends that our Supreme Court "has long . . . held . . . that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract, regardless of how 'harsh the provisions of such contracts may seem in the light of subsequent happenings.'"  Appellant's Brief at 28, *quoting* *Wilson Area School Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006) (opinion announcing judgment of the court ("OAJC")).  Appellant's sole argument is that here, Sienna has not challenged the legality of the 529 Plan, and thus the doctrine of unjust enrichment is not applicable.

Appellant is mistaken.  The OAJC in *Wilson Area School Dist.* stated

---

[8] Additionally, Appellant's claim that he only received $89,518.14 disregards that under Decedent's revised 2013 will, he also received Decedent's house and car.  According to Appellant, Sienna initially challenged probate in a separate proceeding but withdrew her challenge.  Appellant's Brief at 24-25.

that unjust enrichment does not apply when the relationship between the **parties** is founded on a written contract, that is, when: (1) the person who is unjustly enriched and the person to whom he must make restitution have a written contract; and (2) the alleged unjust enrichment is based on or complies with a term of that contract. *See Wilson Area School Dist.*, 895 A.2d at 1254. Here, notwithstanding the existence of written documents (the original 529 Plan and the change of ownership), Appellant executed no written contract with Sienna. Accordingly, this claim lacks merit.

In Appellant's final issue, he asserts that the trial court erred in finding he engaged in fraudulent conduct, where Sienna's amended complaint raised no fraud cause of action. Furthermore, Appellant argues, the court's finding of fraud appears to be based on his alleged dishonesty with Decedent about Decedent's relationship to Brenda. Appellant contends the record showed that he himself was unclear of the relationship between Decedent and Brenda.

The trial court stated:

[Appellant] committed **fraud** in inducing Decedent to act to give him control of the 529 account, intentionally and recklessly implying and/or reinforcing and/or encouraging Decedent's false beliefs that [Brenda] was not officially adopted and that [Ms. Lutz] for many years was exploiting Decedent, without any factual basis and without inquiry. This was done to induce Decedent to harm [Sienna] (and others) and to benefit [Appellant] (and others).

Trial Court Opinion, 8/14/17, at 7 (emphasis added). The opinion also explained the legal elements of a fraud cause of action. *Id.* at 15.

Appellant is correct that Sienna's amended complaint did not raise fraud

- 19 -

as a cause of action. However, he points to no verdict entered on the record — and there is none — as to a count of fraud. Notwithstanding the trial court's citation of legal authority for fraud, the context of the court's reference to "fraud" was germane to its finding that Appellant committed undue influence. *See id.* at 7, 15. In the absence of any verdict on a fraud count, no relief is due.

Judgment affirmed.

Judge Bowes concurs in the result.

Judge Platt concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/24/18